UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

RUSSEL PATRICK BORCK,                              Case No. 2:15-CV-00043-MC

                    Petitioner,                    OPINION AND ORDER

        v.

JOHN MYRICK, Superintendent,
Two Rivers Correctional Institution,

                    Respondent.
_____

McShane, Judge:

Petitioner Russel Patrick Borck brings this petition for writ of habeas corpus pursuant to

28 U.S.C. § 2254, alleging ineffective assistance of counsel. For the reasons explained below, the

petition is denied.

BACKGROUND

In August 2005, Borck, then 21 years old, was released from prison following a felony

conviction for Sexual Abuse III. Not long after, Borck went to his half-sister's home to see his

nieces and have dinner. While in prison, Borck sent several letters to his then 11 year old niece

1    - OPINION AND ORDER

J.[1] These letters, later introduced at trial, were wildly innapropriate and clearly demonstrate Borck was grooming J for future sexual abuse. In the letters, Borck asked if J remained a virgin and asked J to get a camera and send pictures of herself in a bikini. Borck dotted the "i" in J's name with a heart. Borck suggested that upon his release, he and J could perhaps go camping alone.

Shortly after Borck arrived at the home, he barged unannounced into the room J[2] shared with her 11 year old half-sister M. As the girls were showering, their bedroom door was closed. The girls, in various stages of undress, yelled at Borck (then attempting to peer around the door) to leave. Ultimately, M had to slam the door on Borck's head to get Borck to leave.

Borck returned shortly thereafter. Although the father attempted to get Borck out of the room and attempted to make sure the door remained open, Borck kept returning to the room and closing the door. Once in the room, Borck attempted to take pictures of the girls' buttocks. Borck attempted to pull down the M's pants, exposing the crack at the top of M's buttocks. The girls asked Borck to stop.

Borck then told the girls about his sexual prowess. Borck told the girls he had had sex three times that day with his girlfriend. The girls stated Borck removed condoms from his wallet and told them they would need the condoms later. Borck sat on the bed behind M and, over M's objections, began massaging her shoulders. Borck commented on the girls' breast and bra sizes. Borck told the girls that some girls reached orgasm simply from having their nipples licked. The father heard Borck say "orgasm" and promptly escorted Borck from the home.[3]

---

[1] As this case involves minor victims, I use initials for any minors.
[2] In August 2005 J was 12 years old.
[3] The transcript contains a scrivenor's error throughout by listing "organism" for the intended "orgasm." I use the intended term throughout this opinion.

The father then asked the girls to separately write down what happened. Essentially, the girls described the conduct mentioned above. The father then called 911. An officer arrived and the girls essentially described the above conduct. Another officer, trained in interviewing children, separately interviewed M and J the next day. The officer then interviewed Borck. Borck did not deny touching M's breast. Instead, he simply stated that he could have touched her breast while they engaged in "horseplay." Borck also admitted discussing orgasms with the girls.

Borck was charged with several counts of Sexual Abuse I and harassment. The first trial ended in a mistrial when witnesses mentioned Borck's earlier time in prison. At the second trial, the jury convicted Borck of three counts of Sexual Abuse I, three counts of Harassment, and three counts of Endangering the Welfare of a Minor. Borck was sentenced to 75 months on each Sex Abuse count, with two counts running consecutive.

The Oregon Court of Appeals affirmed Borck's conviction in a written decision. The Oregon Supreme Court denied review. Borck then filed a petition for post-conviction relief ("PCR"). After a hearing, the court denied relief. The Oregon Court of Appeals affirmed without opinion and the Oregon Supreme Court denied review.

Borck then filed this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Borck raised four grounds for relief, but only one claim, of ineffective assistance of counsel, is at issue here.[4] Borck alleges he received ineffective assistance when counsel failed to object to certain testimony from Michele Warner, the state's expert witness. Warner, a psychologist, conducted a child abuse evaluation of M at Juliette's House a few days after the incident.

---

[4] Borck's other grounds for relief raised in the petition are waived as he did not attempt to set forth or meet the legal standards in his brief in support of the petition. *Renderos v. Ryan*, 469 F.3d 788, 800 (9th Cir. 2006).

Warner testified that in private practice, she interviewed approximately 350 children and,

"I would estimate of the 350 that probably at least 300 [had been victims of sex abuse crimes]."

ECF No. 25-1, 505. The state inquired:

> Q. Do you have specialized knowledge about the actions and reactions of victims that would help this jury in understanding the actions of the child who has been a victim of a sex abuse offense?
>
> A. Yes. That's part of the training that we go through. One of the most important things to know is that each child is an individual and there is not a particular reaction that we look for and say, oh, yeah, that child has been abused.
>
> Generally speaking, you see the same kinds of distress as you see for any type of emotional stress, you know, maybe if there is a divorce in the family, somebody has been killed, any other kind of trauma, when something is wrong, children, some children react emotionally, some regress to younger kinds of behavior like wetting the bed, sucking their thumbs again, doing those kinds of things.
>
> Again, that doesn't specifically mean they were sexually abused, but it can mean they are under a lot of stress and would fit with that type of thing.
>
> There are other children who maybe are, have been through lots of kinds of trauma and may appear to not react at all. That they just kind of learn how to shut this stuff out. And as you are talking to them, they maybe telling you details of sexual abuse in the same manner that you would expect them to tell you what they had for lunch the day before. So there is a lot of variety is the bottom line.

ECF No. 25-1, 505-06.

Based on the above testimony, the court granted the state's motion to offer Warner as an

expert witness "who can assist the jury in understanding the reactions of a child victim of sex

offenses." ECF No. 25-1, 506-07.

The state then asked of Warner:

> Q. Is it very often that there is a witness, a direct witness to child sex abuse that occurs?
>
> A. Almost never in my experience.

ECF No. 25-1, 514.

4     - OPINION AND ORDER

In describing M's description of the incidents, Warner testified:

The specifics of what [M] said was that [Borck] had touched her breasts with both hands two or maybe three times on top of her clothes. That he had touched her bottom again on top of her clothes. She was very specific that everything happened on top of her clothes.

That he had pulled her pants down exposing her underwear, but her underwear wasn't pulled down. That he had shown her a condom and told her that she would need it later.

That he had taken, he had used his stepsister's digital camera to take pictures of both [J], her stepsister and her of their bottoms as they were bending over, but again they were, they were dressed. She knew that because he showed them the pictures afterwards.

She told me about him telling the girls that he had had sex with his girlfriend three times that day. He also told them that he knew girls who could have orgasms just by having their nipples licked. [M] was clear she didn't understand what that meant, but she knew it was something disgusting, in her words.

He also had talked about, about preferring small boobs on girls, and was trying to compare [the girls] and had kind of pulled their shirts down tight against their body so that he could estimate a cup size on each of them.

ECF No. 25-1, 522-23.

Warner concluded many of Borck's actions qualified as "grooming behavior":

His trying to watch the girls as they are undressing. Walking into the bedroom without knocking. Some of the wrestling around is a way of desensititzing kids. Talking about his own sexual behavior with his girlfriend, making comments about their bodies, their breast sizes.

Showing [M] the condom for some unkown reason. You know, and certainly the pulling her pants down seeing if she will tolerate that. Putting his hands on her breasts even though it was brief. The most, most everything that she described could easily be seen as grooming behavior to see if at some time in the future he could get her to go farther with him.

ECF No. 25-1, 524.

Warner testified nothing in Ms' interview suggested she presented a memorized story or that someone suggested what to say. Warner testified that had M simply wanted to get Borck in

trouble, she would have made the touching seem more intrusive, i.e., would have complained of

under the clothes touching of her genitals. ECF No. 25-1, 535.

Borck's attorney did not object to Warner's testimony. As noted, Borck argues the failure

to object violated his right to effective assistance of counsel.

DISCUSSION

Petitioner alleges ineffective assistance of counsel based on trial counsel's failure to

object to "vouching" testimony by Warner, the therapist who conducted the assessment of M *See*

*Strickland v. Washington*, 466 U.S. 668 (1984). The PCR court denied these claims, and

respondent maintains that the PCR court's decision is entitled to deference under 28 U.S.C. §

2254(d). *See Harrington v. Richter*, 562 U.S. 86, 101 (2011) (on habeas review of ineffective

assistance claims, a state court decision "must be granted a deference and latitude that are not in

operation when the case involves review under the *Strickland* standard itself").

A federal court may not grant a habeas petition regarding any claim "adjudicated on the

merits" in state court, unless the state court ruling "was contrary to, or involved an unreasonable

application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1). A state court decision is

"contrary to" clearly established federal law if it applies incorrect Supreme Court authority or

reaches a contrary result in a case with facts "materially indistinguishable" from relevant

Supreme Court precedent. *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams v. Taylor*, 529

U.S. 362, 405-06 (2000). A state court decision is an "unreasonable application" of clearly

established federal law if the state court identifies the correct legal principle but applies it in an

"objectively unreasonable" manner. *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (per

curiam); *Williams,* 529 U.S. at 407-08, 413. "Even if the federal habeas court concludes that the

state court decision applied clearly established federal law incorrectly, relief is appropriate only

if that application is also objectively unreasonable." *Penry v. Johnson*, 532 U.S. 782, 793 (2001);

*see also Early v. Packer*, 537 U.S. 3, 11 (2002) (state court decisions that are not "contrary to"

Supreme Court precedent may be set aside only "if they are not merely erroneous, but 'an

*unreasonable* application' of clearly established federal law, or are based on 'an *unreasonable*

determination of the facts'").

Under the well-established Supreme Court precedent of *Strickland*, a prisoner alleging

ineffective assistance of counsel must show that 1) "counsel's performance was deficient," and

2) counsel's "deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687.

"Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from

a breakdown in the adversary process that renders the result unreliable." *Id.* Judicial review of an

attorney's performance under *Strickland* is "highly deferential"; it carries a "strong presumption

that counsel's conduct falls within the wide range of reasonable professional assistance," which

under the relevant circumstances, "might be considered sound trial strategy." *Id.* at 689 (citation

omitted).

The parties disagree over the amount of deference this Court owes to the state court PCR

determination. In its written decision denying the same vouching arguments Borck makes here,

the PCR court concluded:

> Petitioner has not proven that defense counsel committed any errors during his
> representation. Specifically, it was not error that objection was not made to the
> testimony of Michelle Warner, in light of the law that governed the case at that
> time. Warner did not offer a "diagnosis," which might be seen as bolstering the
> victim's testimony. Defense counsel was able to ilicit some useful testimony on
> cross examination of Warner.
>
> At the time of Petititioner's trial, the State was permitted to comment on
> "grooming behavior," and especially because of Petitioner's claim that he was
> engaged in innocent play behavior, his conduct was relevant. . . . Even if any error
> could be found, there was no material effect on the outcome of the case,
> considering the strength of the evidence against petitioner, such as both victims'

7    - OPINION AND ORDER

testimony . . . . There is no showing that the court would have entertained an objection to Ms. Warner's testimony.

ECF No. 24-3, 59-61.

Borck argues the state court simply got it wrong:

When Mr. Borck was tried for sex abuse, settled law in Oregon barred prosecution witnesses from vouching for the credibility of complainants in child sex cases. However, Mr. Borck's trial counsel either did not understand or was unaware of the many decisions holding such vouching to be per se prejudicial. Trial counsel therefore repeatedly failed to object to multiple instances of vouching testimony by the State's "expert" witness, a child interviewer at Juliette's House, although, according to prevailing professional norms, a reasonably competent lawyer would have objected and the testimony would have been excluded. *The post-conviction court did not measure counsel's failings according to prevailing professional norms but rather assumed that counsel's incorrect characterization of then-existing law was accurate, Resp. Ex. 124 at 1-2, and so unreasonably denied Mr. Borck relief.*

Sur-Reply, 1-2 (emphasis added).

In other words, Borck challenges the PCR court's application and interpretation of Oregon law. But an error of state law will not justify relief in a federal habeas petition. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). The above hurdle would be no hurdle at all if a petitioner could avoid it simply by arguing that rather than interpreting state law, the state PCR court merely "assumed that counsel's incorrect characterization of then-existing [state] law was accurate." The PCR court concluded the trial court would not have entertained an objection to Warner's testimony based on Oregon law at the time. As to Borck's ineffective assistance claim based on that alleged failure to object, the PCR court's determination of that state-law issue bars federal relief based on that alleged error.

8    - OPINION AND ORDER

More importantly, even assuming that the review here is *de novo*, Borck cannot establish

that counsel's failure to object prejudiced him.[5] Borck argues:

> There was no physical evidence to corroborate the alleged abuse. The
> complainant had a reputation for untruthfulness, and her story about what had
> allegedly happened to her evolved each time she told it. The "expert" witness's
> improper opinions about the complainant's credibility, therefore, were key to the
> state winning it's case.

Br. in Supp., 2, ECF No. 38.

I disagree. Of course there was no physical evidence corroborating the alleged abuse.

This case did not involve a forcible rape. The abuse here was two or three brief gropings of M's

clothed breast. Although M may have had a reputation for untruthfulness, her step-mother, who

commented on M's reputation for untruthfulness (after being compelled to answer the question),

also testified that despite that reputation, she had no reason to doubt M's truthfulness as to the

specific allegations of abuse at issue here. And M's accounts of the abuse largely mirrored those

of J, the only other witness to the abuse. J did not have a reputation for untruthfulness.

Finally, Warner's testimony was not "key to the state winning it's case." In fact, as noted

by both the PCR court and Borck's trial counsel, Warner's testimony was somewhat helpful to

Borck given the circumstances. One would think that the prosecution would return at closing to

hammer home to the jury any "key" evidence necessary to win the case. But the state did not

even mention Warner's alleged "vouching" about M's credibility in its closing arguments.[6] In

fact, Borck's own counsel in closing arguments pointed to Warner's testimony as being helpful

to the defense. For instance, counsel noted the discrepancies in the girls' accounts contradicted

---

[5] The reader should not infer that because I discuss the prejudice prong, I agree with Borck's argument that *de novo* review is appropriate because the PCR court made a "legally unsound" determination of the Oregon "law that governed the case at the time." Br. in Supp., 12. As noted, far from mandating *de novo* review, this reexamination of a state-court determination on a state-law question precludes federal habeas relief. *Estelle*, 502 U.S. at 67-68.
[6] The prosecution briefly mentioned Warner's testimony in closing, but only as it related to Borck's letters and how they constituted "grooming." ECF No. 25-1, 623. That brief mention, on a separate topic is the only mention of Warner in the prosecution's closing.

Warner's testimony that the main details of a sexual assault victim tend to remain constant over

time. ECF No. 25-1, 646. Counsel argued, "And what I am focusing on here is the circumstances

are not conducive to sexual abuse." ECF No. 25-1, 646. This again referenced Warner's

testimony. Counsel noted:

> Both girls were together all the time. Again, Ms. Warner testified very, very, very
> specifically that is not consistent with sex abuse. You heard her say that. There
> are rarely if ever witnesses to sex abuse. She said that. There was never not a
> witness in this case. Jaimie was there the entire time.
>
> * * * *
>
> It is still ligh outside. The lights are on always in the room. Never asked to take
> anybody, you know, to a private place that we talked about. And it is very well lit.
> Sixteen feet away from the father of [M], 16 feet. That's what David said right
> here. He said 16 feet down the hallway. That is not conducive of an environment
> that is set up for sexual abuse. It is not. Ms. Warner testified to that.
>
> Again, it was clear that there were no signs of any arousal on the part of Russell.
> That's uncomfortable. I know we don't like talking about that, and obviously I
> was extremely careful with the children that were on the stand to ask the question.
>
> * * * *
>
> Another circumstances surrounding that household that night, there's no evidence
> whatsoever that anyone,  anyone was requested to touch Russell. Nobody said
> that. Nobody say, yeah, he asked me to touch him here. He asked me to rub his
> shoulders, nobody said that.
>
> Do you have to have that? Of course, you don't. But we are talking about an
> environment conducive to sexual abuse.
>
> * * * *
>
> And the final think I am going to talk about under this category is there's no
> evidence whatsoever that he was ever, that he ever asked anyone to keep anything
> from their parents. They never said, you know, I won't, don't tell mom and dad
> about what we are doing back here. 16 feet away. Witness right there the whole
> time.

ECF No. 25-1, 647 – 649.

Counsel noted Borck was never aroused, never asked the girls to touch him, and never asked the girls to keep anything secret from their parents. Counsel again pointed to Warner's testimony and attempted to contrast that with the girls' allegedly evolving statements. Counsel pointed to Warner's testimony that children could easily be manipulated by adults, perhaps by the father. Only in rebuttal, after the defense raised the issue, did the prosecution point to Warner's testimony that the main allegations of sexual assault victims would tend to remain consistent over time. In contrast to the defense, the state attempted to show the jury that although the surrounding details of the allegations may have evolved, the main details remained consistent.

Borck's stategy at trial corresponds with the affidavit counsel submitted during Borck's PCR proceedings:

> 10. Many aspects of Warner's testimony, in my opinion, helped our case because she testified that there is almost never a direct witness to child sexual abuse. However, in this case, the state's theory was exactly that – that the sexual abuse had occurred in the presence of [J]. Furthermore, in my recollection, Ms. Warner, being characterized as an expert to assist the jury to understand the reaction of child victims in sex offenses, helped us becaue there were many things that she was trained to look for that she admitted during cross-examination that never transpired in this case. That type of testimony, in my opinion at the time, only bolstered our theory that the actions in this case were non-sexual. Her training and experience bolstered our defense and, at the time of trial, I attempted to utilize her as an expert to bolster our defense, without "opening the door" to petitioner's past. I thought that through Warner's testimony we were able to point out how petitioner's actions were not consistent with typical sexual abusers, yet without "opening the door" to *John's*-type evidence. To that extent, I may have allowed for more leeway to Warner's testimony that I would have in other trials. It was a strategic decision, which actually worked because it allowed me to argue those points without the jury ever learning of petitioner's past sexual abuse conviction. Unfortunately, even with that evidence by Warner and the jury hearing nothing of petitioner's past conviction, the jury still found petitioner guilty.
>
> * * * *
>
> 12. Again, quite frankly, a lot of the things that Warner was trained to observe she did not observe in this case and she actually characterized the fact that child sex

11    - OPINION AND ORDER

abuse rarely occurs with a direct witness, but again that was the state's theory in
this case. From my recollection, I felt that Ms. Warner actually benefitted the
defense in this particular case given the issues that were actually important to the
outcome of the trial.

ECF No. 24-3, 11-12.

While it is easy to look back in hindsight and argue Borck's attorney erred, this is

prohibited when reviewing habeas petitions. *Strickland*, 466 U.S. at 689 (noting that while it is

"all too tempting" to second guess defense cousel following a conviction, "every effort [must] be

made to to eliminate the distorting effects of hindsight, to reconstruct the circumstances of

counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the

time."). Looking at these facts, and the challenges faced by counsel, it is clear Borck's

conviction did not result from Warner's testimony.

Borck's own statements to the investigating officer utterly precluded counsel from even

attempting to argue that no contact occurred between Borck and M. The prosecution admitted

into evidence Borck's statements during a police interview a few days after the incidents at issue.

In that interview, Borck admitted: knowing the girls were under 13-years-old; telling the girls

that some girls have orgasms when their nipples are stimulated; walking into the bedroom as M

changed clothes after showering (but denied seeing anything as the girl was behind a door);

telling J her bra "looks kind of small for you" and "I am a good judge of breast size;" ECF No.

25-1, 427 – 28. Borck did not think he told the girls they would be needing a condom later,

denied showing the girls a condom from his wallet, and denied trying to photograph their

buttocks. ECF No. 25-1, 428 – 49. In explaining any contact between himself and the girls,

Borck told the officer he wrestled with M and they were involved in "horseplay." ECF No. 25-1,

430. In describing Borck's description of this horseplay, the officer testified:

12    - OPINION AND ORDER

> Well, he was, he was speaking generally at this point. I don't believe from looking at my notes here that he was talking specifically about [M], but he told me that he would grab the girls around the upper body while he stood behind them, and that he would at times take them to the ground and quote tickle them.
>
> He said during the horseplay, I could have felt [M's] breasts. I asked if he wouldn't remember such an event, and he state to me quote no, it could have happened, I just don't remember it. And then he said to me quote, I can see how it could have happened.
>
> And then he said to me, quote [M], could have thought she was touched by me when we were wrestling and playing around, we did that inside and outside.

ECF No. 25-1 430.

When asked whether he remembered slapping M on the buttocks, Borck told the officer, "I probably did smack her on the butt while we were messing around." ECF No. 25-1, 431. Borck's statements handcuffed his defense. Rather than argue no contact occurred and both girls were outright liars, counsel was forced to argue any contact was innocent, without any sexual intent. But this argument, that any contact was innocent "horseplay," flew in the face of other evidence. Although there was some evidence of Borck wrestling with a younger girl outside, the breast grabbing occurred inside the house, where there was no evidence any "horseplay" occurred. Additionally, Borck's innocent explanation was contradicted by the sexually charged letters he sent to then 11 year old J.

At closing, the state pounced on those letters. Borck asked the girl, his niece, how far she had gone with boys and whether she was a virgin. Borck told his niece to have her mother buy her a camera so the niece could send Borck photographs of herself in a bikini or a g string. Borck asked his niece what size bra she wore and whether she wore regular panties, thongs, or g strings underwear. Borck asked his niece to take pictures of herself in a bubble bath with bubbles covering her body. In the last letter, Borck tells his niece that maybe they can go camping alone together.

13    - OPINION AND ORDER

Borck's own letters significantly hindered his defense. Also hindering the defense was the fact that Borck could not take the stand and offer any sort of explanation. As noted, the abuse here occurred shortly after Borck was released from prison following his felony conviction on an earlier sex crime. Borck's counsel simply played with the hand Borck dealt him. Given the letters, Borck's own damaging statements, the relatively consistent testimony of the girls given their ages, and the fact that Borck could not testify in his defense, counsel was forced to emphasize any helpful facts, even if those facts came from the state's own expert witness. In his opening statement, Borck's counsel explained:

> However, what you are not going to hear is things that are consistent with sexual abuse. You are going to hear about kids having a good time. About [Borck] having a good time. About adults having a good time. But you are not going to hear things that are consistent with someone who is intentionally trying to do some of this conduct or knowingly doing it for that matter as well.

> What you are not going to hear is you are not going to hear about any skin-to-skin contact. You are not going to hear about any turning the lights off. You are going to hear that everything was done in the presence of two kids. They were playing around. They are having a good time. That's what the evidence is going to show you.

* * * *

> You are not going to hear any evidence of any one, of [Borck] asking anyone to touch his private parts. You are not going to hear of any erections on his part. You are not going to hear anything that would indicate sexual things you would hear if it was there. It is not there. That's important. The evidence you don't hear is just as important as the evidence that you will hear.

Tr., ECF No. 25-1, 333 – 335.

> Counsel pursued this strategy when cross examining J:

> Q. All right. And he never turned the lights off?

> A. No.

> Q. And he never asked anybody to take their clothes off?

> A. Not that I recall.

14    - OPINION AND ORDER

Q. Okay. He never started taking his clothes off?

A. No.

Q. He didn't have any, any bulging or anyting coming out of his pants or anything like that?

A. No.

ECF No. 25-1, 383 – 84.

Counsel then asked the following questions of M on cross examination:

Q. And I am going to ask you , this is kind of a sensitive question, but did you ever see him have like a bulge in the front of his pants or anything like that?

A. No. I wasn't paying attention.

Q. Okay. And did you know what an orgasm[7] was before that night?

A. No.

Q. Okay. And he never asked you to touch him; is that right?

A. Right.

Q. And he never told you to not tell your parents anything?

A. Right.

Q. He never asked you to go somewhere in private; is that correct?

A. Right.

Q. He never took you anywhere in private?

A. Correct.

Q. Never turned off the lights, right?

A. Right.

Q. And it was summer time, right?

A. Yeah.

---

[7] The transcript includes "organism" throughout instead of "orgasm." This is a scrivenor's error and I use the correct term in this opinion.

Q. So it was still light at this time?

A. Yes.

ECF No. 25-1, 493-94.

Borck's attorney also contrasted some of the common symptoms Warner testified happen to sexual assault victims against M's actions. For example, Borck's attorney had the stepmother confirm M did not exhibit bed wetting, reversions to more childish behavior, or big personality changes in the months after the incidents. ECF No. 25-1, 568-69.

Borck's attorney also attempted to emphasize the differences in the accounts of the girls from their self-reports written immediately after the incidents contrasted with their comments to the police and, finally, at trial. While some aspects of the testimony remained fairly consistent, some specifics appeared to fall away over time. For instance, although M's written report noted Borck slapped her rear end as "pay back," she testified at trial that Borck never mentioned anything about "pay back." Other apparent inconsistencies include the exact number of times Borck grabbed, tisted, or cupped M's breasts, and whether Borck used one or two hands on each occassion.

Borck's attorney pursued the only defense available given Borck's criminal history, the damaging letters, and the relatively consistent testimony of the girls. That evidence, not any testimony by Warner, resulted in Borck's conviction. Even assuming a reasonably competent attorney would have objected to Warner's testimony, the failure to do so here did not prejudice Borck.

CONCLUSION

Petitioner's Petition for Writ of Habeas Corpus (#2) is DENIED and this case is

DISMISSED. A Certificate of Appealability is denied on the basis that petitioner has not made a

substantial showing of the denial of a constitutional right pursuant to 28 U.S.C. § 2253(c)(2).

IT IS SO ORDERED.

DATED this 28th day of March, 2017.


_____/s/ Michael McShane_____
Michael McShane
United States District Judge

17    - OPINION AND ORDER